UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00101-TBR

LARRY D. JOHNSON                                                                                         Plaintiff,

v.

STELLA-JONES CORPORATION                                                                        Defendant.

**MEMORANDUM OPINION**

This matter comes before the Court upon the Motion to Exclude Opinion Testimony of Dr. Belinda Merritt, (Docket No. 42), filed by Defendant Stella-Jones Corporation ("Stella-Jones" or "the Company"). Plaintiff Larry D. Johnson has responded, (Docket No. 44), and Stella-Jones has replied, (Docket No. 45). Fully briefed, this matter stands ripe for adjudication. For the reasons set forth below, the Court will DENY Stella-Jones' motion.

**Factual Background**

On August 24, 2012, Johnson delivered a load of crossties to the Stella-Jones wood treatment facility in Fulton County, Kentucky. As the crossties were unloaded, a stack of lumber fell from the trailer and landed on Johnson's right hip and foot. He fell to the ground, unable to stand under the lumber's weight. After the accident, he complained of pain in both his neck and his right foot. In the instant personal injury action, Johnson alleges that Stella-Jones' negligence caused him to fracture his C3 and C4 vertebrae.

On the day of the accident, physicians at the Jackson-Madison County General Hospital ("Jackson-Madison County") performed a CT scan and an MRI of Johnson's cervical spine. The CT scan report recorded a "noncorticated linear lucency through the anterior bridging osteophytes at C3-C4 which

1

may represent a fractured osteophyte."[1] (*See* Docket No. 42-1, Radiological Consultation Report, CT Scan.) The radiologist who summarized the MRI noted "some mild edema seen at the level of the anterior osteophyte arising from the superior margin of C4 that would be consistent with probable fracture involving this osteophyte." (*See* Docket No. 42-2, Radiological Consultation Report, MRI of Cervical Spine.) No pre-accident images were available for a comparative study.

From August 28, 2012, through September 12, 2012, Johnson received treatment at the Cane Creek Rehabilitation Hospital ("Cane Creek") in Martin, Tennessee. Dr. Merritt, a physiatrist, treated Johnson on three occasions. Dr. Merritt did not interpret Johnson's radiological studies, nor did she diagnose his fracture. Instead, she relied upon the diagnosis provided in his discharge summary from Jackson-Madison County. (*See* Docket No. 42-3, Deposition of Dr. Merritt of 6/17/14, at 7.) At deposition, Dr. Merritt opined to a reasonable medical probability that Johnson's injuries were consistent with the history that he provided—that is, that the crossties fell on him and caused a fractured osteophyte at the C3 and C4 vertebrae. (Docket No. 42-3, Deposition of Dr. Merritt, at 5.)

On cross-examination, Dr. Merritt acknowledged that before the fall, Johnson had been diagnosed with diffuse idiopathic skeletal hypertrophy, or DISH, which causes spurring down the vertebrae. (Docket No. 42-3, Deposition of Dr. Merritt, at 7.) When asked if it was possible that Johnson had suffered a fracture in the C4 osteophyte before the accident, Dr. Merritt replied, "Is it possible? I'm not trying to be flip or anything, but anything could be possible"; however, she emphasized that such a preexisting injury would be implausible. (Docket No. 42-4, Deposition of Dr. Merritt, at 2.) According to Dr. Merritt, a fractured osteophyte would generally cause pain, swelling, or problems breathing and swallowing; however, she did not ask Johnson if he suffered from such symptoms, and they were not reflected in her records. (Docket No. 42-4, Deposition of Dr. Merritt of 6/10/2014, at 4.)

---

[1] An osteophyte refers to an outgrowth of bone, similar to spurring. (*See* Docket No. 42-3, Deposition of Dr. Merritt of 6/17/14, at 7.)

Stella-Jones now characterizes Dr. Merritt's testimony as unreliable and inadmissible. The Company therefore urges the Court to preclude Dr. Merritt's opinion regarding causation at the March 23, 2015, jury trial of this matter.

## Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or data;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (applying *Daubert*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999))). The district court must determine whether evidence proffered under Rule 702 "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

*Daubert* endeavors to strike a balance between liberally admitting relevant evidence and excluding misrepresentative "junk science" from the courtroom. *See Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F3.d 256, 267 (2d Cir. 2002)). The inquiry is "a flexible one," and [t]he focus . . . must solely be on principles and

3

methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 594-95. Courts typically consider several factors in this analysis, including whether the theory or method in question "can be (and has been) tested," whether it "has been subjected to peer review and publication," whether it has a "known or potential rate of error," and whether the theory or technique enjoys "general acceptance" in the "relevant scientific community." *Id.* at 177 (citing *Daubert*, 509 U.S. at 593-94). The Sixth Circuit has developed further guidance on Rule 702 by articulating several "[r]ed flags that caution against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citing *Best*, 563 F.3d at 177). These include "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Id.* (citing *Best*, 563 F.3d at 177.)

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Although a *Daubert* hearing is not a prerequisite, the court must ensure that the disputed testimony is both relevant and reliable. *See Clay v. Ford Motor Co.* 215 F.3d 663, 667 (6th Cir. 2000). A trial judge enjoys "considerable leeway" in this determination. *Kumho Tire*, 526 U.S. at 152; *accord Conwood*, 290 F.3d at 792; *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000); *see also Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 672 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line." (internal citations omitted)).

**Analysis**

Stella-Jones contends that Dr. Merritt's testimony falls short of Rule 702's criteria. The Company emphasizes that Dr. Merritt did not personally diagnose a cervical fracture, but instead relied upon the judgment of the Jackson-Madison County physicians who initially treated Johnson.

In response, Johnson points to Federal Rule of Evidence 703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

The advisory committee's notes on this rule clarify that expert opinions may base their opinions upon not only firsthand observation or presentation at trial, but also upon information that has been presented to them outside of court and that he has not personally perceived.[2] Relying upon the advisory committee notes, Johnson contends that Rule 703 contemplated this very situation and favors admission of such testimony: the rule allows a physician to base her diagnosis on reports and opinions produced by other medical personnel. Accordingly, Johnson concludes that Dr. Merritt's opinion is admissible.

However, Johnson misperceives Stella-Jones' objection. The Company agrees that Dr. Merritt was certainly entitled to rely upon the Jackson-Madison County records, but it attacks the conclusion that she drew from them. Because Rules 702 and 703 trigger distinct analyses, Johnson's response is largely misplaced.[3]

---

[2] The advisory committee's note reads, in relevant part:

> Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians, and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decision in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.

[3] Johnson submits that the Jackson-Madison County General Hospital documents constitute a self-authenticating record and are thus admissible pursuant to Federal Rule of Evidence 902. Because the admissibility of these records is not at issue, the Court need not address this argument.

According to Stella-Jones, the Jackson-Madison County data is far from definite, reflecting only a "qualified diagnosis." The Company underscores language in the CT scan and MRI reports that it perceives as equivocal. The CT scan impression indicated a condition "which may represent a fractured osteophyte" and the MRI summary reflecting "mild edema . . . that would be consistent with probable fracture." (Docket Nos. 42-1, 42-2.)

The Court is not convinced that the radiological studies were inconclusive, as Stella-Jones advances. Even if there language were less than definite, though, other documents in the Jackson-Madison County chart diagnose a fracture with definite language, providing a sufficient basis for Dr. Merritt's opinion. For example, Johnson's discharge summary from Jackson-Madison County reflects a principal and significant diagnosis of "C3-C4 anterior osteophyte fracture with mild ligamentous injury," and the CT scan results were

> consistent with DISH in the lower cervical spine with non-cortical linear lucency through the anterior bridging osteophytes at C3-C4. The patient also had MRI of the spine, which was noted for fracture involving the osteophyte, anterior and superior endplate of C4, with probable mild edema in the soft tissue between spinous process of C3 and C4. The patient also had x-rays with fractures as described above.

(Docket No. 62-1, Jackson-Madison County Medical Records, at 2.) An imaging report of his spine taken on the date of the accident reflected "a fracture through the base of the ossification where it attaches to the superior endplate of C4." (Docket No. 62-1, Jackson-Madison County Medical Records, at 8.) And most plainly, another document advised Johnson, "Your caregiver has diagnosed you as having a cervical fracture." (Docket No. 62-1, Jackson-Madison County Medical Records.) Such language is far from speculative and provides ample grounds for Dr. Merritt's testimony.

Stella-Jones further contends that regardless of the diagnosis's reliability, Dr. Merritt's failure to eliminate other potential causes of Johnson's fracture—that is, to perform a differential diagnosis— proves fatal to her testimony. *See Tamraz*, 620 F.3d at 674 ("A differential diagnosis seeks to identify the

disease causing a patient's symptoms by ruling in all possible diseases and ruling out alternative diseases until (if all goes well) one arrives at the most likely cause.") (citing *Hardyman v. Norfolk & Western Railway Co.*, 243 F.3d 255, 260-61 (6th Cir. 2001)).  The Company points to Johnson's diagnosed DISH, which caused osteophytes to form along his cervical spine.  Dr. Merritt admitted that Johnson could have suffered a fracture prior to the accident, but she did not review his medical records to determine whether such a fracture occurred.  She testified that Johnson would likely have had a loose body in his neck and experienced selling and pain if he had fractured the osteophyte before the accident—but she also admitted that she had no evidence that he suffered these symptoms after the accident.  (Docket No. 42-4, Deposition of Dr. Merritt of 6/10/14, at pp. 3-4.)

The Sixth Circuit has confirmed that a differential diagnosis can serve as a satisfactory way to determine causation.  *See, e.g.*, *Hardyman*, 243 F.3d at 260 ("One appropriate method for making a determination of causation for an individual instance of disease is known as 'differential diagnosis.'"); *Best*, 563 F.3d at 178.  However, governing authority renders the differential diagnosis method essential to admitting a physician's testimony.  To the contrary, "to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."  *Cornwood* 290 F.3d at 794 (6th Cir. 2002) (emphasis in original (quoting *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (internal quotation marks omitted).  *See also Daughtery v. Chubb Group of Ins. Companies*, 2011 WL 5525738 at *7 (W.D. Ky. Nov. 14, 2011) ("[T]he *Best* opinion does not stand for the proposition that a doctor offering an opinion as to causation *must* use a differential diagnosis in forming that opinion. . . . The *Best* Court did not hold that differential diagnosis is the only method doctors could use when forming causation opinions.").  Consequently, Dr. Merritt's failure to eliminate other causes as the source of Johnson's fracture does not render her testimony unreliable.

The alleged deficits that Stella-Jones perceives may be exposed and explored during cross-examination.  However, they do not constitute the purely speculative "junk science" that *Daubert* seeks to

7

eliminate.  The arguments raised here are better left for the jury to assess.  Therefore, the Court will deny Stella-Jones' motion to exclude Dr. Merritt's testimony.

## Conclusion

For the reasons set forth above, the Court will deny Stella-Jones' motion.  (Docket No. 42.)  An appropriate order will issue concurrently with this memorandum opinion.

cc:  Counsel